**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **CRIMINAL NO. PWG-19-0140** |
| **ADAM MARTIN,** | |
| **Defendant** | |

**RESPONSE IN OPPOSITION TO
DEFENDANT'S APPEAL OF DETENTION ORDER**

Defendant Adam Martin, a career offender, seeks appellate review of the Honorable Beth P. Gesner's order of detention.  *See* ECF 206.  Martin does not challenge any of Judge Gesner's factual findings that he poses a danger to the community.  Nor does he attack the presumption that applies in favor of detention.  This is not surprising.  Martin is a high-level drug trafficker with access to firearms and a history of poor performance under court supervision.  Under the Bail Reform Act, armed recidivist drug dealers who repeatedly violate the terms and conditions of their probation simply are not candidates for release.

Instead of contesting Judge Gesner's findings on their merits, Martin relies on the speculative prospect of a COVID-19 outbreak at Chesapeake Detention Facility ("CDF"), the pretrial facility where he currently is housed.  Yet neither Martin nor any other detainee at CDF has been diagnosed with or exposed to COVID-19.  Further, CDF administrators and staff have established comprehensive precautionary measures to previse transmission of COVID-19 into CDF.  Moreover, Martin's requested relief would place an untenable strain on the resources of the Pretrial Services Office and the Court.  In light of those measures, and given the medical resources to which Martin has access at CDF, the Court should conclude that Martin's continued detention

is necessary to protect the public, and that the emergence of COVID-19 is not a card to be played by armed drug traffickers who wish to get of jail.

## BACKGROUND

Adam Martin is a lead-defendant in a 17-defendant conspiracy case arising out of an investigation into a drug trafficking organization operating in the Edmondson Village area of Baltimore, Maryland. From at least November 2018 through February 2019, FBI investigators intercepted phone calls during which Martin and his co-conspirators discussed the distribution of narcotics at an open air drug market that the DTO controlled. Physical and electronic surveillance revealed that Martin supplied crack and other narcotics to the DTO's street-level distributors. On April 10, 2019, the FBI executed a search warrant at two stash houses that Martin maintained, resulting in the recovery of five firearms, over 200 grams of cocaine base, and other narcotics.

On June 20, 2019, Martin was charged with conspiring to distribute more than one kilogram of heroin and more than 280 grams of crack, in violation of 21 U.S.C. § 846, which carries a sentence ranging from 10 years' to life imprisonment. ECF 4.[1] Five days later, on June 25, 2019, Judge Gesner held a detention hearing, at the conclusion of which she found by clear and convincing evidence that Martin posed a risk to the safety of other persons and the community and that there was no condition or combination of conditions that would reasonably assure community safety. ECF 71. Judge Gesner highlighted that the government's evidence included "substantial wire conversations describing [the] use of guns and violence" and the "seizure of firearms." *Id.* Judge Gesner also noted this defendant's "poor adjustment to community

---

[1] A grand jury returned a superseding indictment charging Martin with these same violations on January 23, 2020. ECF 176.

supervision," including violations of the probation and that the instant offense was committed while the defendant was still on supervision. *Id.* Martin filed the pending appeal on March 12, 2020. ECF 206.

## ARGUMENT

A defendant may appeal a Magistrate Judge's detention order to the District Court. 18 U.S.C. § 3145(b). In considering such an appeal, the District Court reviews the Magistrate Judge's detention order *de novo*. *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001). Thus, the District Court must make "an independent determination of the proper pretrial detention or conditions of release." *Id.*[2]

### I. The Appeal Ignores Nearly All of the Section 3142(g) Factors, Which Weigh Heavily in Favor of Detention

Martin's appeal, which focuses exclusively on the COVID-19 outbreak, largely ignores the factors a court must consider in determining whether a defendant poses a danger to the community and upon which Judge Gesner relied in ordering detention. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against Martin, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

---

[2] The district court need not conduct a new pretrial detention hearing; rather, the court may base its decision on the original detention hearing and any additional evidence proffered by counsel. *See United States v. Williams*, 753 F.2d 329, 331 & n.7 (4th Cir. 1985).

In this case, an examination of the § 3142 factors, which Martin ignores, demonstrates that the detention order should remain in place.

### A. The Nature and Circumstances of the Offenses

As a leader of the DTO, Martin was responsible for helping pump kilograms of poison into the streets of Baltimore for the duration of the investigation. Martin adulterated drugs for street-level distribution, provided packs of narcotics to lieutenants, and personally sold drugs himself to paying customers. He also kept multiple firearms at his stash houses. As the Court is well aware, neighborhood DTOs like the one Martin helped manage are responsible for hundreds of deaths in Baltimore each year, either as a result of violent acts committed by DTO members or overdose deaths suffered by the DTO's customers.

### B. Weight of the Evidence

The evidence against Martin is overwhelming. It established that he was a leader in the DTO between September 2018 and June 2019. The following wiretap interceptions are examples of the numerous interceptions between Martin and indicted co-conspirators:

- On December 28, 2018, Cedric HITE called MARTIN and asked, "ALRIGHT, ALRIGHT, SO WE ON, WE ON HOLD FOR A MINUTE?" MARTIN confirmed that drug sales at the shop should stop and told HITE to be careful because the police were in the area.

- On January 2, 2019, HITE again called MARTIN to tell him he had drug proceeds to turn over to MARTIN. During the call, MARTIN accused HITE of losing drug proceeds. Later that day, HITE spoke to MARTIN and admitted to losing the drug proceeds and owing MARTIN money.

- On February 1, 2019, MARTIN called Raekwon JONES to check on the status of drug sales. JONES told MARTIN, in substance, that heroin and cocaine sales had started increasing lately and that customers particularly liked the heroin. MARTIN responded, "OH YEAH, I KNOW. I COOKED LAST NIGHT," meaning he had processed the current supply of heroin.

- On February 8, 2019, Eryica DAVIS told MARTIN, in substance, that an associate had stolen drugs from her, and MARTIN responded, "Alright, we said that we gonna beat the fuck out of this bitch."

- On February 17, 2019, MATHEWS told MARTIN that he had run out of heroin and was helping RAEKWON JONES sell the last amount of heroin that he possessed.

- On February 19, 2019, officers on patrol recovered multiple bags and containers of heroin, cocaine base, and marijuana that were hidden near the drug shop. Shortly thereafter, JONES spoke to MARTIN by phone and told him, "THE POLICE TOOK ME AND BRO PACK."

- On February 28, 2019, police seized heroin from HITE. Following the seizure, MATTHEWS called MARTIN and reported that the police had taken drugs from HITE. MATTHEWS also complained that members of the DTO were carrying all of their drugs on their persons, including Corey BELL. MARTIN said he would speak to BELL.

- On March 2, 2019, DAVIS called MARTIN to obtain a supply of drugs. MARTIN said he would travel to meet DAVIS to provide a re-supply.

In other intercepted conversations, Martin and his co-conspirators discussed procuring firearms. For example, on December 16, 2018, Martin spoke to Justine Antoine, who is currently charged with Discharging a Firearm Resulting in Death, regarding Antoine's desire to buy a long gun. When Martin told Antoine not to sell the firearm he currently possessed, Antoine acknowledged that he would both keep his current gun and obtain a new one, stating "that will put some shit down though."

Investigators took multiple enforcement actions directed at Martin. On February 4, 2019, the police seized 32 grams of cocaine base that Martin had just sold. On February 19, 2019, officers saw Martin searching an alley for narcotics that investigators had just seized. As discussed above, officers seized substantial quantities of narcotics and firearms from Martin's stash houses.

5

### C. History and Characteristics of the Person

Martin has a lengthy criminal record and a history of poor adjustment to community and court supervision.[3] His criminal behavior began with a string of juvenile adjudications. Over the course of a year, from October 1998 through September 1999, Martin received four juvenile adjudications for distributing controlled substances. He received a probationary sentence each time. Ex. A ¶¶ 2–5.

This troubling pattern continued after Martin became an adult. In September 2001, at age 19, he sustained his first adult conviction for possession of cocaine. *Id.* ¶ 7. Two months later, while on probation, Martin was convicted of Possession with Intent to Distribute Controlled Substances, resulting in an effective sentence of nine months' incarceration followed by a term of two years' incarceration due to another probation violation. *Id.* ¶ 8.

In February 2004 alone, Martin was convicted in three separate cases. First, he was convicted of Distribution of Cocaine, which arose from the seizure of substantial quantities of drugs and three of Martin's handguns. *Id.* ¶ 11. Second, he was convicted for Distribution of a Controlled Substance with a Firearm. *Id.* ¶ 12. Third, he was convicted of Possession with Intent to Distribute Cocaine. *Id.* ¶ 13. For these three cases, Martin received a concurrent 5-year term of incarceration. He was released from custody in October 2006. *Id.* ¶¶ 11–13.

After a series of drug possession charges, Martin was again convicted in 2013 for unlawfully possessing a firearm. *Id.* ¶¶ 15–17. He received an effective sentence of five years' imprisonment, and was released to probation in 2016. *Id.* ¶ 17.

---

[3] Martin's criminal record is summarized in the pre-plea criminal history report, prepared by the United States Probation Office, which will be provided to the Court separately as Exhibit A.

Consistent with this lengthy criminal record, Martin's history is replete with various violations of probation. Indeed, the instant offense was committed while Martin was on probation for his most recent handgun offense.

As a result of his criminal conduct, Martin has accrued 17 criminal points, placing him substantially above the threshold to qualify as Criminal History VI—the highest criminal history category in the U.S. Sentencing Guidelines. *Id.* ¶ 20. If he were convicted of a controlled substance offense, Martin would qualify as a career offender. *Id.* ¶ 21.

Martin attempts to downplay his criminal record, particularly the firearms offenses, stating "there are no crimes of violence in his history" and "[t]here are two convictions involved [*sic*] firearms, but nothing involving the discharging or threatening of someone with a weapon." ECF 206 at 4 n.7. It is clear from Martin's record, however, that his conduct has become increasingly dangerous over time, escalating from street-level drug dealing and firearms possession to helping manage a large scale DTO.

### D. The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release

Martin is a recidivist. He has not stopped, nor will he stop, dealing drugs and carrying guns. He will not comply with court-ordered supervision. If he were placed on location monitoring, there is little to stop him from continuing his drug business or simply deciding to flee. That is particularly the case where, as here, much of the conduct involved coordinating drug trafficking via cellular telephone. A substantial risk therefore exists that in the event of Martin's release he would continue to operate his DTO either personally or through intermediaries.

Martin's repeated disregard of the terms and conditions of court and community supervision also poses a substantial health risk in the event of his release. To combat the COVID-19 outbreak, medical professionals are recommending extraordinary measures to protect the

community, such as avoiding close contact with other people (so-called "social distancing"). If Martin were to get infected, his record belies a willingness to abide by this guidance, jeopardizing the health of any others with whom Martin may come in contact. Martin cannot even comply with court orders regarding the terms of his own supervision, much less CDC health recommendations. In short, Martin's release would pose a substantial and imminent threat of danger to the community.

## II. Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak

Martin himself does not contest this analysis, focusing instead on the health risks posed by the COVID-19 outbreak. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of Martin's release. Currently, there are no cases of COVID-19 at CDF. Martin acknowledges he does not have COVID-19. He does not allege that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental health." Instead he relies solely on the *possibility* of becoming infected. As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[4]

### A. Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19

---

[4] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Riser.

transmission into and inside CDF.[5] DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention (CDC) and Maryland Department of Health (MDH) regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulting in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[6]:

- *Social Visitation*. DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[7] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.

---

[5] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

[6] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[7] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per day to ensure that each detainee is able to remain in contact with friends and family members.

- *Detainees Entering the Facility.* Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new arrestees who present a particular safety risk to the community and individuals already are in transit to the facility.

- *Screening Procedures.* In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for approximately one week, where he will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.

- *Detainee Movement.* The Court's Second Amended Standing Order postponed all criminal trials scheduled to commence through April 24, 2020, and postponed all criminal proceedings through March 27, 2020. Case No. 1:00-mc-0302, ECF No. 93 (filed Mar. 14, 2020). This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies. In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever. To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.* Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day. Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently. The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning. In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.

- *Quarantine.* DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers*. Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar. The USMS has appointed Steven D. Akers, the former Assistant USMS Chief, to serve as a liaison with the Court, and to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

### B. Martin's Medical Needs Are Adequately Being Addressed at CDF

Although Martin states that he is in particular danger because of his asthma, diabetes, and high blood pressure, ECF 206 at 3–4, his medical needs are being met and safety measures are in place at CDF in the event of an outbreak. When Martin first was arrested and transported to CDF, he underwent an extensive intake process, whereby he was screened and examined by licensed medical professionals who are now fully apprised of his medical conditions.

By virtue of being in a detention facility, Martin is in the presence of medical professionals at all times. Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension. There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses. Asthmatic detainees in particular are permitted to keep their inhalers on their person, and have access to respiratory therapy treatments and oxygen onsite. DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for

Asthma therapy and other chronic diseases. In addition, clinical pharmacists are on call at all times, day or night. If Martin should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, Martin has access to all of the care that he needs. If Martin needs treatment for asthma, diabetes, or high blood pressure, he will receive it. In the unlikely event that Martin becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And if Martin needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient resources, both inside and outside CDF, to ensure that Martin's medical needs are addressed. If Martin were released, it is doubtful that he would "have much more access to healthcare in the community" as he claims in his appeal. ECF 206 at 5.

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999). In this case, Martin simply has not made a factual record that his needs will not be met while detained.

### III. Releasing Defendants Like Martin Would Place An Undue Burden on the Pretrial Services Office and the Courts

Martin asks to reside with this wife and be subject to "24/7 electronic monitoring." ECF 26 at 4. For the reasons discussed above, however, a combination of electronic monitoring and release conditions will not protect the public from a high-level drug trafficker with access to firearms and a history of poor performance under court supervision. Further, awarding such relief would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, as well as the Court.

Whenever the Court orders electronic monitoring, a Location Monitoring ("LM") Specialist is appointed to oversee the Defendant's pretrial release. In the Northern Division, there are only two LM Specialists, each of whom currently handles approximately 30 cases.[8] To be sure, one case, by itself, would not strain the system. Yet if the Court released Martin—a leader of a large scale DTO with a lengthy criminal record—then undoubtedly an avalanche of defendants would also seek release. Releasing such defendants would not only endanger the community; it would quickly stretch the bandwidth of existing LM specialists beyond its breaking point.[9]

Similarly, the Court would be flooded by appeals of defendants seeking pretrial release. Each defendant would make the generic argument, now being made by Martin, that he should be released "to reduce contact with other persons" and "have much more access to healthcare in the community." ECF 206 at 4–5. The Magistrate Judges in this District, however, have repeatedly detained defendants like Martin to protect the community *from them*. The speculative prospect of

---

[8] This information was provided by W. Scott Smith, Deputy Chief U.S. Probation Officer.

[9] Before a Defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these Officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection.

a COVID-19 outbreak at CDF does not diminish the public interest in keeping armed drug dealers off the streets. In light of the protective measures now in place at CDF, and given DPSCS's prior track record in avoiding viral outbreaks at their facilities, the specter of a COVID-19 outbreak is not a fire alarm that defendants can pull because they wish to get out of jail. The continued detention of defendants like Adam Martin is necessary to ensure public safety and does not endanger public health.

## CONCLUSION

For the foregoing reasons, the Court should deny Martin's motion and order his continued detention pending trial.